IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2019

**STATE OF TENNESSEE v. WILLIE LEE WILSON, JR.**

**Appeal from the Circuit Court for Haywood County**
**No. 7686    Clayburn Peeples, Judge**

_____

**No. W2018-01671-CCA-R3-CD**

_____

The defendant, Willie Lee Wilson, Jr., appeals his Haywood County Circuit Court jury convictions of aggravated robbery, theft of property valued at $1,000 or less, and evading arrest, arguing that the evidence adduced at trial was insufficient to sustain his convictions. Because the evidence was insufficient to support the defendant's conviction for theft of property valued at $1,000 or less relevant to a handgun, that conviction is vacated, and the charge is dismissed. The defendant's other convictions are affirmed.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; and Vacated and Dismissed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, and D. KELLY THOMAS, JR., JJ., joined.

Bob C. Hooper, Knoxville, Tennessee, for appellant, Willie Lee Wilson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Garry G. Brown, District Attorney General; and Jason Scott and Christie Hopper, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Haywood County Grand Jury charged the defendant with one count of aggravated robbery of the Country Corner Market ["the Store"] at the Fast Fuel gas station in Brownsville, one count of theft of property valued at $1,000 or less for cash stolen from the Store, one count of theft of property valued at $1,000 or less for a stolen Smith and Wesson handgun, and one count of evading arrest.

At the April 17, 2018 trial, Teresa Grandberry testified that, on January 6,

2017, she stopped at the Store at approximately 11:15 a.m. on her way home from work as was her daily routine. She recalled that it was cold that day and that there was snow on the ground. After making her purchases, she returned to her vehicle, and, before driving away, she saw a person wearing a ski mask and carrying a purse with an "M" on it walking into the Store. When she saw that the person in the ski mask had a gun, she drove away and called 9-1-1. While driving and while on the telephone with the 9-1-1 operator, she "looked in [her] mirror" and saw the same person "running down the street," which information she relayed to the 9-1-1 operator. After turning onto her street, she saw police officers "running across the field behind the baseball field" near a high school.

During cross-examination, Ms. Grandberry described the purse that the person was carrying as "tan color" with a gold "M" on it. She explained that she saw the handle of a gun sticking out of the bag and described the gun handle as black and "kind of wide." She estimated that five to seven minutes elapsed between her seeing the man at the Store and seeing him running down the street. In describing the man to the 9-1-1 operator, Ms. Grandberry said that he was wearing "[a]ll black" and carrying a purse. She stated that she could not determine the man's race because he had covered his hands and face.

Harsh Patel testified that he was the manager at the Store located at 680 North Dupree Street. He was not at the Store during the robbery but arrived approximately 10 minutes later because his mother, who was working there, called him about the robbery. He stated that the Store had operational surveillance video cameras that covered activity where the registers were located. After the robbery, he made several copies of the surveillance videos and gave one copy to the Brownsville Police Department. The jury viewed footage of the robbery from two surveillance videos.

On cross-examination, Mr. Patel described the robber on the surveillance videos as wearing a dark jacket. He explained that the security cameras were not high quality and that the colors depicted in the videos "can't be taken at true value." Although he stated that he could not identify the actual color of the perpetrator's jacket, he acknowledged that it was a dark color. He explained that the discrepancy in the color of the robber's jacket between the two videos resulted from the videos' having been taken from two different cameras.

Rajeshree Patel testified that she was working at the Store at the time of the robbery. She stated that, at approximately 1:00 p.m., a man entered the Store, showed her a gun, and said, "Give me money. Give me money." She opened her cash drawer, and the robber dumped the contents of the draw into a "big purse," which she stated was

-2-

a Michael Kors bag. He then demanded that she open a second drawer, which she did, and she gave him the money from that drawer as well. Ms. Patel stated that she pushed a panic button but did not otherwise call the police.

Ms. Patel described the perpetrator as being tall and wearing long sleeves, a mask, and gloves. She stated that, although she could see only his eyes and "his skin at the top," she could tell that he was a black man. She estimated that the robber took approximately $420 in the robbery but noted that the Store had recovered the stolen money.

On cross-examination, Ms. Patel described the robber as being approximately six feet or six feet and one inch tall and weighing approximately 170 pounds. She acknowledged that the defendant was not six feet and one inch tall. She stated that the perpetrator took the Michael Kors purse with him when he left the Store. According to Ms. Patel, the lighting inside the Store was "bright." She acknowledged telling the police on a previous occasion that the robber took approximately $300 from the Store.

Brownsville Police Department Officer Michael Clayborn testified that he received a call of an armed robbery at the Store. He responded to the location where the robber was reported to be running. He saw a man matching the robber's description running, and Officer Clayborn identified himself as police and ordered the man to stop. When the man continued to run, Officer Clayborn began to chase him on foot. Because the suspect "turned around . . . several times during the chase," Officer Clayborn suspected that "he possibly had a weapon or was intending to do something." According to Officer Clayborn, the chase lasted approximately two minutes and ended when the suspect sat down against a fence in a backyard of a house. Officer Clayborn testified that he saw the suspect throw a light tan leather purse over a fence. The suspect pulled off his mask, at which time Officer Clayborn recognized him as the defendant. While the defendant was being arrested, Officer Clayborn saw that the defendant had a gun, which Officer Clayborn described as "a black handgun." Officer Clayborn was wearing a body camera at the time, but explained that it fell off while he was chasing the suspect.

During cross-examination, Officer Clayborn testified that the robbery suspect was described to him as "wearing all black" with "a gray hoodie type hood over his head" and "wearing a mask." He estimated that he chased the defendant for "about a football field's length" and stated that he never lost sight of the defendant during the chase. He recalled that the defendant was wearing two pairs of gloves—a pair that was "light gray or white color" covered by see-through blue gloves.

On redirect examination, Officer Clayborn explained that the suspect was running toward a vehicle where other officers had found two men, Johnny Nixon and Antonio Walker, with drugs and weapons.

Brownsville Police Department Sergeant David Culver testified that he responded to the armed robbery call and assisted Officer Clayborn in pursuing the suspect. He joined in the foot chase and, after the suspect sat down on the ground, the officers took him into custody. Sergeant Culver stated that when the suspect removed his mask, he recognized him as the defendant. He collected a Smith and Wesson gun from the defendant's person and gave it to another officer to be collected as evidence. After placing the defendant in a patrol car, he called for an ambulance because the defendant was "having trouble breathing." The jury viewed excerpts of footage taken from Sergeant Culver's body camera showing the defendant being placed in a police vehicle and later being treated in an ambulance and Sergeant Culver removing the defendant's gloves. Sergeant Culver stated that the gloves he collected from the defendant were standard surgical gloves.

During cross-examination, Sergeant Culver testified that Brownsville Police Department policy required officers to wear a body camera every day while at work and explained that the camera had to be manually activated. He testified that he was aware that two other gentlemen were detained and charged in connection with the case, but he did not know any further details. He acknowledged that the gun used in the robbery had no distinguishing marks. He also acknowledged that, while chasing the defendant, he "lost sight of him for a moment."

Randy Taylor, who, at the time of the robbery, was employed as a Sergeant Investigator with the Brownsville Police Department, testified that he responded to the armed robbery. While en route to the Store's location, he heard a report that a vehicle was leaving from Penny Lane, and he recognized the vehicle's description from prior robberies. Upon learning this information, he ordered officers to detain the vehicle and to detain Mr. Nixon and Mr. Walker, the occupants of that vehicle. He responded to that vehicle's location and observed "several bags of marijuana and a handgun in plain view." He testified that Mr. Nixon and Mr. Walker were arrested for drug possession and not in connection to the robbery. The location where Mr. Nixon and Mr. Walker were arrested was in front of the house where the defendant was arrested, and Sergeant Taylor saw the defendant "sitting beside a fence in the backyard of the house." Sergeant Taylor investigated the trail from the scene of the robbery to the place of the defendant's arrest. He photographed numerous items found on the ground, including cash, a Michael Kors purse, a ski mask, and a body camera. The jury viewed these photographs. The jury also viewed a photograph of the defendant taken on the day of the robbery in which the

-4-

defendant is wearing a white t-shirt, black jacket, gray hooded sweatshirt, and black pants. Sergeant Taylor acknowledged that he "r[a]n the serial numbers of the firearms" collected in this case and, based on that inquiry, charged the defendant "for being in possession of a stolen weapon."

During cross-examination, Sergeant Taylor confirmed that the Smith and Wesson handgun recovered from the defendant was a common gun, and its only distinguishing feature was the serial number. He acknowledged that during his investigation, he did not trace the trail all the way from where the defendant was arrested to the Store; but rather, he backtracked only to the Haywood High School property. He stated that he did not submit any evidence for DNA testing and did not ask the victim to identify the defendant because he was wearing a mask during the robbery. Sergeant Taylor explained that he did not wear a body camera during the incident because he was an investigator. He acknowledged that the photograph of the defendant taken on the day of the robbery showed "a small scratch over the left side of his lip" but stated that he did not think the defendant received the scratch during the arrest. Sergeant Taylor described Mr. Walker as "tall" but stated that he could not estimate his height. He acknowledged that he never saw the defendant possessing the purse.

The jury found the defendant guilty as charged and, after a sentencing hearing, the trial court imposed an effective sentence of eight years' incarceration. During a hearing on the defendant's motion for new trial, the court merged the theft conviction stemming from the petitioner's stealing cash from the Store with the aggravated robbery conviction as a lesser-included offense, but it otherwise denied the defendant's motion. In this timely appeal, the defendant argues that the evidence at trial is insufficient to support his convictions.

*Sufficiency of the Evidence*

The defendant makes a general claim of insufficient evidence that does not allege insufficiency as to any specific element but instead suggests that the State failed to establish his identity as the person who committed the offenses. The State contends that the evidence is sufficient to support the convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct

-5-

evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361 app. at 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

Here, the proof adduced at trial established that the Store was robbed by a person wearing a ski mask, a gray hooded sweatshirt, a dark colored jacket, and blue gloves and carrying a handgun and a tan Michael Kors purse. Ms. Grandberry reported seeing the robber running down the street, and the police responded to that location and chased a man who matched the description of the robber. When Officer Clayborn and Sergeant Culver arrested the defendant after a two-minute foot chase, he was wearing clothing that matched the description of the perpetrator's clothing described by Ms. Grandberry and as shown in the Store surveillance videos, and he was in possession of a Smith and Wesson handgun. Officer Clayborn saw the defendant throw a purse over a fence, and officers recovered a Michael Kors purse with cash inside of it and on the ground around it.

From these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant robbed the Store at gunpoint and stole less than $1,000 cash and fled from police officers. That being said, the proof adduced at trial was insufficient to establish that the defendant stole the Smith and Wesson handgun. To be sure, the evidence clearly established that the defendant possessed the weapon, but the only proof that the gun had been stolen was Sergeant Taylor's testimony that he "r[a]n the serial number[]" through some database, which resulted in his deciding to charge the

defendant with a weapon's related offense.[1]  In our view, this information was insufficient to establish that the defendant stole the weapon.  *See* T.C.A. § 39-14-103(a) ("A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent.").

Accordingly, we vacate the defendant's conviction of theft of property valued at $1,000 or less for the handgun and dismiss that charge, but we affirm the trial court's judgments as to the defendant's other convictions.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[1]     Sergeant Taylor testified that he charged the defendant with possession of a stolen weapon; however, the affidavit of complaint filed in the Haywood County General Sessions Court and signed by Sergeant Taylor states that the defendant was charged with theft of property valued at less than $500 for possessing a stolen "Smith & Wesson, semi automatic handgun valued at $449."